Good morning. May you please support Natalia Nekrasov for the petitioner? I'd like to reserve two minutes for rebuttal at the end. Right. Watch your time. Yes, Your Honor. This case involves denial of asylum to evangelical Christians who were forced to flee Egypt due to escalating attacks by Muslim fundamentalists. The issues are whether the harm that they suffered in the past amounted to persecution on account of religion at the hand of Muslim fundamentalists that the government is unable and unwilling to control. And the second issue is whether they have a well-founded fear of future persecution. As to the past persecution, the cumulative harm that they suffered amounted to persecution. They have suffered escalating harassment, discrimination, requirement of forced conversion at work, which caused them to forsake their teaching careers. The female petitioner was assaulted while she was six months pregnant, and the male petitioner was beaten to the point that he required five stitches on his head. There was escalating death threats. Where is the evidence that she was—you mean the incident with Professor Wafik? Correct. She was assaulted? She was threatened in a manner that she feared for her safety. She was threatened because he said to her, you're too good to be a Christian, you should be a Muslim. I will make you a Muslim my way. So she was threatened verbally, but he didn't touch her. Yes, that's correct, Your Honor. All right, thank you. However, the male petitioner was physically harmed. Right. Now, he needed five stitches on his head because of the assault by the dean and other professors when he came to inquire about what Wafik had done to his wife, right? Yes, Your Honor. And he reported that to the police, but they didn't fill out a police report. Yes, Your Honor. He reported the names, the cause of the argument that they had, as well as the reasons for it. And they were told specifically that they should not file a report because this is a conflict between a Muslim and a Christian that would cause sectarian strife. Let me ask you this. Since the petitioner's got favorable credibility findings. Yes, Your Honor. We take their testimony as being true. The five-stitch incident, what is the government connection to the five-stitch incident? Why is he being persecuted by the government by that? Your Honor, the administrator, when the male petitioner appeared to ask questions about the threats against his wife, which were religiously based, he had a meeting with the administrator and Mr. Wafik, who are both Muslim fundamentalists, and they both tried to convert his wife to become a Muslim. Was it a public school or a government-run school? It was a government-run school. Yes, it was a public school. And according to the record, the administrator actually told the petitioner, the male petitioner, that the problems that both him and his wife were having were because they were preaching Christianity and they were active Christians. I'm not talking about that. They were being persecuted because of their religion, but it has to be persecution by the government. Now, we know from Mansour that simply because public school teachers are employed by the government in Egypt, they are not government representatives for purposes of persecution, much to the disagreement of Judge Pragerson in his dissent when he said they should be. All right, but that is not our law. What is the government religious persecution of Mr. Abid in the five-stitch incident? Your Honor, the male petitioner went to the police with the evidence of being persecuted by Muslim fundamentalists. So you're saying the police failure to persecute shows an uncontrolled group. Yes, Your Honor. Okay. And that's the distinction between this case and Mansour. Now, the other question I have, pardon me for interrupting you so much. Yes, Your Honor. But the IJ made a finding, and we are reviewing the IJ. The IJ made a finding that relocation was available based on the family of the male petitioner and the family of the female petitioner, all of whom are Christians, all of whom are living in Egypt in different places. And these people, the petitioners, are young, relatively young, educated people who don't face any of the unusual circumstances of the Nezevic in the Nezevic case, which relocation was not allowed. All right? Why is that finding not supported by substantial evidence, the relocation finding? Yes, Your Honor. First of all, the immigration judge, if the past persecution, if the harm that they suffered rose to the past persecution, then the burden should have been on the government to rebut with the preponderance of the evidence that there's a fundamental change of circumstances as well as or that they can reasonably relocate and will be safely to do so. The only thing, she never addressed whether or not the government met that burden. Even if only well-founded fear of future persecution is found and the burden is, in fact, on the petitioner to show a reasonableness of relocation, it's a dual analysis under Kaiser v. Ashcroft where if it's unsafe, they don't need to reach the reasonableness of relocation. She never addressed that aspect of relocation. Another thing is, the only ---- But she did. She said they have relatives all over Egypt, and they're young, and they're well-educated, and they can get a job somewhere, as is shown by the fact that they left teaching and went into a taxi company and did very well and moved into a better apartment, et cetera. My question to you is, is that finding regarding availability of relocation an erroneous finding which we should reverse? Yes, Your Honor. In the fact that the petitioners, the immigration judge ignored the fact that the petitioners are, in fact, evangelical Christians and not Coptic Christians. They chose that religion in their adulthood, early adulthood. And this particular denomination requires or involves the way they testified, spreading of their faith more actively so than the Coptic faith. And none of their family members are actually evangelical Christians. And, in fact, some of the family members also had problems because one of the brothers was ---- his co-workers were trying to convert him, a Coptic Christian, to Islam, and he ended up prosecuted for defaming Islam in that matter. So the relatives were also targeted as Coptic Christians. But the petitioners are, in a way, Christians as it is, are a disfavored group. But petitioners are, in a way, highlighted even from that group in the way that they are evangelical Christians, which is part of one of the main precepts of their religion, is to spread their faith so they would be more standing out out of the community. Therefore, no matter where they would relocate, they would take that immutable characteristic with them and would be highlighted. So your legal analysis would be that the IJ's determination of relocation was made on an erroneous factual basis to wit. He was analyzing the relocation possibilities of Coptic Christians, which have been there for thousands of years, but not evangelical Christians, and therefore the relocation possibilities of these petitioners as evangelical Christians was not correctly analyzed. Do you wish a remand to the BIA on that issue? That's one of the issues that should have been addressed, even though she states it in the very beginning that they were in fact evangelical Christians. Well, she also didn't put the burden on the government, which should have ended. Correct. Relocation was not addressed properly as part of the burden of the government, as well as if the petitioner had the burden. He showed in the evidence that he's an evangelical Christian, not similarly situated as his family, and therefore could not be lumped into the same group and analyzed in the same manner. What's the closest case that you have that would support a finding that the client and his wife rose to the level of persecution? Yes, Your Honor. This court actually held similar, even less harm in some of the cases. Rana v. Ashcroft, where a Guatemalan national was closely trailed and actively pursued after death threats, however, never experienced any physical injury. In this case, we have death threats that escalated with people showing up at the place of business looking for the petitioner, destroying violently his office, and continuing with the death threats. As well as he was personally injured, required five stitches on his head, and just cumulatively, this amounts to more harm than what Ruano has suffered. Karablina v. Zaynaz, also another case where she was harassed and discriminated, just like petitioners, had one physical attack, whereas petitioners also have destruction of property, very violent, which was actually directed at the male petitioner if he were at work at the time. They were looking for him specifically during the day, during the work hours. And Bobala v. Ashcroft, where it involves death threats and destruction of property but no physical injury, whereas in this case there's more harm in addition to that. They also have the physical injury that he experienced. Why, again, should the burden be on the government on the relocation? On the relocation, the burden should be on the government because under HCFR 1208.13b1i, once the petitioner shows past persecution, the burden shifts to the government. They have to show fundamental change in circumstances or relocation. So that should have been the burden. The only thing they submitted was a country report, which actually shows, and in fact quoted in the opposing counsel's brief, that there was violence, forced conversion of cops, as well as violent attacks against Christians in Egypt. So it doesn't meet their burden of the preponderance of the evidence that there's a changed circumstance. Also, under Rios v. Ashcroft, generalized country conditions cannot be used to rebut specific claim on specific facts. And nothing was pointed out as to petitioner-specific facts, why it should be there's a changed circumstance. Well, I'll give you some time on rebuttal because we've taken up a lot of your time with our questions. But your time is up now, and we'll hear from the government. Thank you. May it please the Court. My name is John Devaney. I'm here on behalf of the Attorney General. As we've been, as this Court's already been discussing, the issue today is the past and future persecution findings made by the immigration judge. Now, it's a contention of the government that these findings, both the past and future persecution findings, were premised on three independent and separate bases, each of which is a valid reason for denial of the petition for review. Given the deferential standard of review in this case, the government contends that all three of these, all three of these bases are valid. However, even if the Court were to find only one were valid, the petition for review must still be denied. In terms of past persecution, the immigration judge's decision was based on three independent bases. First, the immigration judge concluded that the harm the petitioner suffered did not rise to the level of persecution. Second, the immigration judge determined that the harm that the petitioner suffered was not an account of religion. And third, they determined that those that harmed the petitioner were not forces that the government was unable or unwilling to control. And now, on the issue of future persecution, there were similar findings made. The immigration judge concluded that the petitioners had not shown that if they were to return to Egypt, the harm they would suffer would be on account of their religion. They also had not shown that the harm they would suffer, or the people that would harm them, would be forces the government was unable or unwilling to control. And additionally, we have the relocation finding, that petitioners, it was their burden, since past persecution had not been established, for them to show that internal relocation was not a reason for which they were not, which they were unable to do. Kennedy, I want to interrupt you for a second. Mr. DeVaney, certainly getting beaten over the head and having your scalp opened, which requires five stitches, is a little bit more than harassment. It qualifies as persecution, does it not? Well, but the question is, we get to the issue of who did it, but that by itself, isn't that past persecution? Well, as Your Honor has mentioned, harassment and discrimination, while morally reprehensible, usually don't rise to the level of discrimination. I would argue that harm falls outside of the persecutory harm we're discussing, because as this was the petitioner, one of them going to the office and addressing an issue with his wife, and as far as we know, he didn't enter the office and they said you're a Christian and attacked him. But let's take it in context. First of all, no adverse credibility finding. That's correct. Secondly, Mr. DeVaney says that his wife had been harassed by Wafik, maybe not sexually harassed, but harassed by Wafik to become a Muslim, and she was a Christian and she had to run out of the place because of the harassment. He went there to straighten that out. The principal and other teachers harassed him and beat him over the head and opened his scalp for five stitches. Now, they weren't talking about football games, right? They weren't talking about the IMF fund. They were talking about Christianity and their exercise of Christianity. Were they not, from all the evidence that we have? Briefly before I answer that, I would like to highlight that the findings of the immigration judge in this case are given deference, and because he was the immigration judge was the one to hear the evidence and the one to make the decision. Ultimately, the immigration judge concluded that it was unclear what was being discussed there. It is possible it was Christianity. It's also possible that it was a dispute over the way he felt that his wife was mistreated. Why was his wife mistreated? Because of Christianity? But why was violence, you know, why was the male Petitioner treated violently? We don't know. Was there any other point of dispute in the evidence? Was it over wages and conditions? Was the union not representing them? Was there anything else other than Christian exercise that caused this dispute? Is there — I think that what we're uncertain, what could have caused the dispute was saying, I — I — the treatment you gave my wife is unfavorable, or I'm angry at you, or it could have been an altercation based on — And why was that treatment unfavorable? Because of wage and hour disputes? Even if Christianity was the underlying debate, when he was — when he was not in the office, when he was in the office, it's unclear that the reason he was attacked is because of his own beliefs. But the problem that you have, Counselor, as I understand this, is when we're reviewing it, we have to determine this on a credibility finding that is positive. So I have to give the remarks of the person, the alien, who is now making these statements, the idea they're credible. I do not have to even think about uncredible. I have to give them the benefit of the doubt as to those remarks. That's what makes Judge Bea's question so important. If we find him credible as to what happened, he doesn't say it was anything except Christianity on her part or his. And that I.J. found that, and then on that record suggested that there was somehow some disputed evidence as to where it could be. Seems to me they made a bad decision there. So we've got to go to something else besides that. Well, Your Honor, I would renew my previous argument that the board, that the immigration judge's conclusion should be given deference there. But, however, I would also like to repeat that even if this Court finds that what happened there, that the treatment there did rise to the level of persecution, there was still the alternate independent basis of the immigration judge's decision that the persecution was not on account of religion and that those that harmed the immigrant and those that harmed the alien. What could it be on account of anything other than religion? Well, the Petitioners, when they taught at school and were Christians, before they began actively, you know, actively, you know, converting or teaching, were never harmed. It was once they started violating school policy that they were actually. That school policy was that Christian classes were to be taught. That's the policy of the government, that the school should, you know, should do that. However, the school, whether the policy was right or wrong, and it seems to be in the face of, you know, it seems to be contrary to the policy of the country, was that they did not want Christianity taught at the school. And the Petitioners did not go through the proper channels. The wife never asked anyone at all. The husband asked and was told, please don't, but continued to do it. Well, when he asked, he got his head split open. He – his head was split open over the issue of his wife, not over whether he was allowed to teach Christianity in the school. And to continue, even if – even if this Court has doubts on that issue, we still have the issue of whether or not these – those who perpetrated the violence were forces the government was unable or unwilling to control. There was one comment in the Petitioners' testimony when he was describing the incident about being hit on the head where the people who were hitting him on the head said, go ahead, go – go to the police, make a report, which I think a reasonable inference with that – from that would be that they knew that the police wouldn't do anything to him. So, you know, go ahead, file a report. That's not going to help you out at all, and it's certainly not going to hurt us. Well, in response, Your Honor, I'd like to – Then that's exactly what happened. Well, in that particular – well, he filed – he attempted to file a report, at which point the police suggested that he didn't, and he chose not to. But I would like to point this – direct this Court's attention to the recent Lolong decision, which analyzed this very question, unable and unwilling to control. And the whole thing in Lolong was that so long as the government has a general commitment to containing violence and takes concrete steps towards realizing that commitment, that is enough. And in Lolong, it was a general policy against – against violence against Christians, and arrests being made were enough. Now, in this case, we have – we have in the, you know, 2003 religious freedom report a statement that the government has continued to take steps to contain sectarian tension. We also have the police report filed in the taxi incident, which was taken seriously. They filed the report. The police, you know, wrote everything down, told Petitioner that they would make an investigation. So what we have here is a general commitment by the government and concrete steps being taken by the government to address this problem. Well, the country report for – let's see. I don't know what year it is, but it's in the record – says that there's some improvement in the government's respect for religious freedom, such as greater recognition and tolerance. However, the government continued to fail to bring to justice those responsible for killing 21 Christians at Al-Qush, and converts – converts from Islam face periodic detention and discrimination. There are abuses and restrictions. So it seems to me that you don't just look at the – what the government says. You look at what the government's doing. I would agree. I think the whole thing along – well, the point was that it doesn't have to be perfect. It's not ideal, and it is unfortunate. But if you can point to positive steps being taken towards the government, those same reports talk about increased tolerance, interfaith discussions, things like that. And here we have evidence in this very case of police taking claims seriously. When Petitioner was – when Petitioner's brother was brought in for defaming Islam, he was released after review of the evidence. And I would say that generally we're seeing a government that's taking concrete steps, although not perfect steps, towards their commitment to ending the violence between, you know, the two religious groups. I notice my time's running out. If there's no more questions, may I briefly sum up? Sure. In this case, the immigration judge properly based his past and future prosecution findings on three separate independent bases. Given the deferential standard of review, it's the government's contention that all three were valid. However, even if this Court believes that only one of these bases are valid, they must deny the petition for review. Thank you. I'll give you a minute since you went over your time. I also wanted to mention with Gizia that was asked of the Petitioners when they opened the taxi business. The Petitioners credibly testified that Gizia involves a religious concept, that non-Muslims living in a Muslim country have to pay Gizia or be killed or convert to Islam. These are their only options. That's why they were attacked. So this is a very religious underlying concept. I have no problem with that. Gizia is a discriminatory tool by Muslim fundamentalists against Christians. What is the governmental connection with the exaction of Gizia? Well, Your Honor, when the Petitioners went to the police previously, they were not helped. So their new report, even though it was taken, it was a cursory report similar in Mashiri v. Ashcroft where Afghani family filed a report and the German government did take the report. If the government is actually unwilling to actively pursue these cases, this report has no meaning. Just like in this case where they don't have to guess what the police would do regarding their reports against Muslims because they were already told that they will not take these reports against Muslims because it will incite sectarian strife. They personally were told so. So they don't need to guess as to what the police would do in the matter. All right. Thank you, counsel. This case will be submitted for decision. The next two matters on the docket, Gideon and Sarah Macune, are also submitted.
judges: Wardlaw, Bea, N. R. Smith